UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   22-14026-CR-CANNON

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

DANIEL ZAMOT,

    Defendant.
_____:

## DEFENDANT'S MOTION FOR DOWNWARD VARIANCE

At barely 18 years-old, Daniel Zamot, a scared, damaged, teenager participated in the worst mistake of his life. He followed his co-defendant, Artavis Spivey, and participated in a carjacking. Daniel Zamot did so, in part, to protect his family. He was immediately remorseful. He admitted his involvement and cooperated. Then, because of his assistance to the United States government, Daniel Zamot's family was threatened by Spivey again. Now safe, he is coming to terms with his own trauma, unique mental health needs, and has plans to become a welder in construction like his step-dad. Daniel Zamot is redeemable, and justice requires a downward variance in this case.

At only four or five years old, Daniel Zamot started displaying signs of mental health issues. PSI ¶ 53. Early diagnoses included hyperactive disorder and bipolar

1

disorder. *Id.* and Dr. Sheila Rapa Report "Rapa" at 2[1]. In 2009, at just five years old, Daniel's family applied for social security disability based on his behavioral health. Rapa at 2. In elementary school, Daniel Zamot was determined to need Exceptional Student Services by Hillsborough County and also provided with an individual education plan (known as an "IEP"). Rapa report at 3 and PSI ¶ 53. Daniel Zamot was also prescribed medication starting in elementary school. *Id.* When Daniel was seven years old, school records indicate he was tested and found to have had a Full Scale IQ of 76, which qualified him as "Specific Learning Disabled." Rapa at 3. The school also noted his behavioral health diagnoses of ADHD and Bipolar Disorder. *Id.* at 3-4. Records document that he received multiple psychotropic medications, including psychostimulants and mood stabilizers, without positive results. *Id.* at 4. In 2012, when Daniel Zamot was 8 years old, he was granted social security disability. Rapa at 2; *see also* PSI ¶ 53, 58. Daniel was placed in six different schools during five years of elementary school, and he was eventually assigned to a school for children with disabilities. Rapa at 4. He stopped taking his prescribed medication sometime between 13 and 15 years old and started smoking marijuana for his anxiety. PSI ¶ 53-54, Rapa at 6. In school, he was often bullied, made fun of, and he fought other kids. Rapa at 4 and PSI ¶ 55. The highest grade he completed was eighth grade. Rapa at 4 and PSI ¶ 55. While transitioning to middle and high school, Daniel Zamot was overwhelmed by larger class sizes, teenage social dynamics, and bullying. Rapa at 4.

---

[1] A copy of Dr. Rapa's report has been provided the probation office and to the Government. A copy will be filed separately with the Court, accompanied by a motion to permanently seal the record.

Daniel Zamot's need for individual support remained high, but as he aged, his services decreased. *Id.* At sixteen years old, Daniel Zamot moved from the Tampa area to Avon Park and changed schools yet again. At seventeen, a new IEP was conducted and Daniel Zamot's was placed in a regular public school with regular kids and standard large classes sizes, with the exception of one "learning strategies course." At that high school, his grade point average was .38 and his expected graduation was to take place in five years (not the standard four), when he was twenty-two years old. At seventeen years old, he was emotionally, mentally, and academically overwhelmed and could not keep up. In describing Daniel Zamot, his mother told probation, "[he] may look like a man, but he does not have the mind of a man." PSI ¶ 53.

Shortly after moving to Avon Park, when Daniel Zamot was just 16 years old, he was ambushed and shot by a neighborhood teenager in retaliation for a fight over a cell phone. *See* PSI ¶ 51-52 and Rapa at 6. Around 2:00 in the morning on December 2, 2020, Daniel Zamot heard his apartment doorbell ring and the voice of someone claiming to be pizza delivery. *See* PSI ¶ 51-52. When Daniel opened the front door, a teenaged neighbor invaded his apartment and shot him six times, including in his chest (puncturing his right lung), in his arm (requiring a rod to be implanted), in his thumb (which had to be partially amputated), and in his spine. *Id.* Ten days of emergency surgery and hospitalization saved Daniel Zamot's life. *See Id.* at 52. After outpatient rehabilitation, he eventually learned to use his arm and get dressed himself again. Daniel Zamot was shell-shocked but alive, with a painful bullet

3

fragment remaining in his spine. *See Id.* As will be discussed below, Psychologist Dr. Sheila Rapa conducted an interview and testing and determined that "[a]fter being shot and nearly killed, Daniel presents with symptoms consistent with a diagnosis of Post-Traumatic Stress Disorder (PTSD). Per record and interviews, he did not receive mental health or victims' assistance services following that incident." Rapa at 7.

Fourteen months later, Daniel Zamot participated in a carjacking to keep his mother, sister, and newborn niece from meeting that same, devastating fate. Artavis Spivey came to Zamot's home and threatened to shoot Zamot's mother, sister, and niece, if Zamot did not help him.[2] Scared and vulnerable, no longer safe in his home, Daniel Zamot made the fateful decision to obey.

Daniel Zamot met Artavis Spivey met at the local basketball court just days before the carjacking. Indeed, Spivey was released from Florida prison only 18 days before the carjacking. *See* Florida Department of Corrections Offender Search, http://www.dc.state.fl.us/offenderSearch/detail.aspx?Page=Detail&DCNumber=J90360&TypeSearch=IR (last accessed November 1, 2012). They smoked marijuana together and Spivey asked Daniel Zamot if he wanted to join a gang. Daniel Zamot said "no" and that he usually hangs out with younger teens around the basketball court. At the basketball court, Daniel Zamot saw that Spivey carried a firearm.

---

[2] Daniel Zamot gave this information to the FBI during various debrief sessions. In addition, immediately after his arrest, Daniel called his mother with the assistance of another inmate and had the inmate explain to his mother the threat to their family and why Daniel committed the crime—Daniel was ashamed to speak to his mother. Daniel's mother, Clara Flores, has confirmed this conversation took place.

On the day of the carjacking, they smoked marijuana together. Then, Spivey told Zamot that he needed to go with him to steal a car or he would shoot Zamot's family. Spivey was at Daniel Zamot's apartment, where his sister and baby niece just left on an errand. Daniel Zamot knew Spivey had his firearm on him and that Spivey knew where his family lived. So, Daniel Zamot followed Artavis Spivey.[3]



Daniel Zamot trailed Artavis Spivey as they walked through town. Eventually they walked to the field where the carjacking took place. Spivey told Daniel Zamot that he was going to take the victim's car. PSI ¶ 11. Unfortunately, Daniel Zamot continued to follow him.



---

[3] Although they are similarly dressed, Daniel Zamot is heavier set than Artavis Spivey, which makes him easy to identify in the video surveillance. The parties agree that Daniel Zamot is the figure seen following the first individual in all of the videos.







The video shows that Spivey approached the vehicle first, while Daniel Zamot was still several feet behind the vehicle. Spivey spoke to the victim and threatened her. Daniel Zamot caught up with Spivey and stood next to him, while Spivey brandished the firearm. Daniel Zamot stood by silently. Notably, the victim, who was focused on Spivey, believed that Daniel Zamot remained at the rear of her car during the carjacking. *See* Stipulated Facts at DE 35, p. 2. Daniel Zamot's conduct that day was serious, but this Court should consider that Artavis Spivey was the leader and Daniel Zamot the follower.

Artavis Spivey brought his criminal lifestyle to Daniel Zamot, induced him to participate in the carjacking by threatening his family, and later tried to make Daniel Zamot his fall-guy by threatening Daniel Zamot and his family again. In June of 2022, the jail erroneously put Artavis Spivey in the same dorm as Daniel Zamot. There, Spivey asked to see Zamot's discovery, confronted him about "snitching" and cooperating with the federal government, and then threatened Daniel Zamot's family again--if Daniel Zamot did not write a letter to the Court and exonerate him. Spivey and a jail house lawyer told Daniel Zamot what to write and where to send the letter. Spivey even offered to send Daniel Zamot money in prison for his commissary. This time, Daniel Zamot prevented a crime and a possible fraud upon the Court by saving the letter in his property and alerting the Government.[4] Because of his cooperation with the Government, Daniel Zamot will likely continue to be a target of Spivey's and other inmates- especially if he testifies in open court at Spivey's sentencing. The

---

[4] A copy of the letter is attached to this filing.

defense agrees with the Government's that departure pursuant to § 5K1.1 is appropriate, DE 77, but the defense submits that the amount of the departure should be substantially greater than 20 percent. A final recommendation to the Court will be made by both parties following the sentencing of Artavis Spivey.

In determining the appropriate sentence, this Court should also consider that the driving motivator behind Daniel Zamot's unfortunate actions was the desire to protect his family. *See e.g. Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) (The defendant's motive for committing the offense is one important factor [in determining the sentence].); 1 W. LeFave & A. Scott, Substantive Criminal Law § 3.6(b), p 324 (1986)("Motives are most relevant when the trial judge sets the defendant's sentence, and it is not uncommon for a defendant to receive a minimum sentence because he was acting with good motives, or a rather high sentence because of his bad motives."); *U.S. v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014)(in conspiracy to provide support to a foreign terrorist group, departure from 240 months to 108 months reasonable because defendant was "a person of substance and decency who was motivated solely to assist the Tamil minority in Sri Lanka." While the motivations "did not justify or excuse acts of terrorism" it was "not inappropriate for the court to take these motivations into account."). Where serious coercion or duress played a part in the crime, but is not a complete defense, USSG § 5K2.12 authorizes the Court to depart. The policy statement states in part:

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's

8

> actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency.

USSG § 5K2.12, p.s. Defense counsel is asking the Court to consider a downward variance, in part, in consideration of the fact that Daniel Zamot followed Artavis Spivey into this crime and only did so in an effort to protect his mom, sister, and her baby (his niece) from being shot. His motivation was to protect his family. Yet, Daniel Zamot quickly realized that his flawed actions were not entirely justifiable. He felt terrible for the victim of this crime, and he did not mount a coercion defense at trial. To that end, this Court should also consider Daniel Zamot's quick and genuine remorse, his decision to cooperate, and his acceptance and ownership of his mistakes.

Daniel Zamot's poor decision-making in this carjacking may be partially attributed to his young age, his intellectual limitations, and his various mental health diagnoses. *See generally* Rapa report. Dr. Rapa conducted her own intellectual testing, and similar to the findings in the school records, Dr. Rapa found Daniel Zamot to have an overall composite IQ score of 77. Rapa at 10. Such a score is within the margin of error for mild intellectual disability, and perhaps more significantly, an age equivalent score of just over 10 years of age. *Id.* In other words, Daniel Zamot's intellectual functioning is similar to that of a 10-year-old.

According to the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2013) (DSM-5), persons with low IQ are

9

often immature, gullible, naive, and vulnerable because they are at risk of being manipulated by others. *Id.* Dr. Rapa found these character traits in Daniel Zamot. *Id.* Specifically, Dr. Rapa found "Daniel lacks the ability to abstract and fully evidence consequential thinking." *Id.* at 15.

While the defense is requesting a downward variance, it is notable that the guidelines consider that a person with significant intellectual disabilities meets the criteria for departure under USSG § 5H1.3. *United States v. Rothwell*, 847 F. Supp. 2d 1048, 1052, 1059 (E.D. Tenn 2012). In *United States v. Rothwell*, the Court granted a request for downward departure in a child pornography case pursuant to USSG § 5H1.3 because of the defendant's limited mental capacity. *Id.* at 1052. Rothwell's intellectual disability was demonstrated by his Full Scale Intelligence Quotient ("IQ") of 77, which placed him in a borderline range of functioning. *Id.* Although Rothwell had successfully graduated from high school, he had a "very limited degree of social awareness and competence," spelled at a third-grade level, and had the reading and comprehension skills of a middle school student. *Id.* Rothwell lived with his parents, worked on the family farm, and relied on his parents to oversee his finances and other living matters. *Id.* 1051-52. Notably, the Court in *Rothwell* granted both a downward departure based on USSG § 5H1.3 and a downward variance pursuant to 18 U.S.C. § 3553(a). *Id.* at 1078. As such, the term of imprisonment was reduced to 18 months from an advisory guidelines range of 41-51 months. *Id.* at 1058, 1078.

Daniel Zamot has an identical IQ score and similarly limited functioning. Like the defendant in *Rothwell*, Mr. Zamot has lived a simple life where he has always

10

been supported by his mom and sisters. At just 18 years old, he has always lived at home with his mother, and she has largely managed his daily routine his entire life, including his finances, household chores, and other living requirements, like obtaining food and cooking. Daniel Zamot's only work was for three months at a McDonalds. PSI ¶ 58. Unlike Rothwell, Mr. Zamot did not graduate high school. PSI ¶ 55. A teacher's comment in his social security disability application read:



Daniel Zamot's limited intellectual functioning distinguishes him from the typical case or typical defendant covered by the guidelines.

Daniel Zamot's low intellectual capabilities make him especially prone to suggestive behavior from his deviant peers, like Artavis Spivey. The DSM-5 states that "Gullibility is often a feature [of intellectual disability], involving naïveté in social situations and *a tendency for being easily led by others*. Gullibility and lack of awareness of risk may result *in exploitation by others* and possible victimization, fraud, *unintentional criminal involvement*, false confessions and risk for physical and sexual abuse." DSM-5 at p. 38 (emphasis added). Daniel Zamot should have found a way to deal with Spivey's threat to his family without committing a carjacking and endangering the victim in this case, but the scientific literature explains his limited thinking and corroborates his exploitation.

11

Additionally, this Court should consider the youthful nature of Damiel Zamot, an immature, eighteen year-old teenager, as a reason to grant a downward variance. Indeed, departure ground USSG § 5H1.1 Age (policy statement) states that "Age (including youth) may be relevant in determining whether a departure is warranted…" In support of a youthful variance, in the Northern District of Ohio, the Court wrote that it reviewed the scientific literature and "there is compelling evidence that the judicial system's longstanding principle of treating youth offenders differently than adult offenders is justified in part based on the unformed nature of the adolescent brain." *United States v. Stern*, 590 F. Supp. 2d 945, 953 (N.D. Ohio 2008). The Supreme Court upheld a District Court's decision to downward vary a 21 year-old's sentence where he was a "middleman in a conspiracy distributing 10,000 pills of ecstasy" based in part on his youth and "[r]ecent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five...." *Gall v. United States*, 552 U.S. 38, 58, 128 S. Ct. 586, 601, (2007). The defendant was sentenced to probation. *Id.* In upholding the sentence, the Supreme Court quoted two of their prior cases that held "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Id.* "For Daniel [Zamot], this dynamic is compounded by his borderline intellectual functioning, low IQ and history of trauma." Rapa at 12.

After evaluation and testing, Dr. Rapa determined that Daniel Zamot's trauma from being shot in his own home merits a diagnosis of PTSD. Such a disorder, when

untreated, may lead someone to make unwise, impaired decisions. This disorder, combined with his mild intellectual disability finding mitigate his criminal culpability. Likewise, his mental health diagnoses and intellectual limitations are consistent with Daniel Zamot playing a smaller role in the offense including no decision making or planning in the offense, standing by as Artavis Spivey brandished a firearm, and literally following Artavis Spivey across town to steal the car. Dr. Rapa explained Daniel Zamot's convergence of youth and mental health issues this way:

> Daniel experienced significant trauma at a time when his brain was not yet fully developed in that he was shot multiple times, at his home, in the presence of his mother when he was just 16 years old. Additionally, he was a persistent marijuana user at the time of the offense, in an apparent attempt to self-medicate his anxiety and trauma. All of these aforementioned variables in this paragraph on their own are known to impact decision making, reasoning, and executive functioning. At the time of the offenses, Daniel was not receiving treatment for his conditions. It is very likely due to his borderline intellectual functioning and problems with executive functioning that he was easily manipulated and persuaded and did not fully account for nor fully understand the reverberating consequences for his actions on the day the offense was committed.

Rapa at 12. Daniel Zamot's diminished functioning, his impaired decision making, and his youthful brain mitigate his culpability and should mitigate his punishment.

Other than a dismissed case from a fight with his sister when he was seventeen, this is Daniel Zamot's first criminal prosecution. PSI ¶ 38. His first stint in jail. His first guilty plea. His first felony conviction. It is also the first time he faces a prison sentence. As a first-time convicted felon, Daniel Zamot faces a host of statutory and regulatory collateral consequences that will follow this 18-year-old teenager for the rest of his life. He loses his right to vote. He loses his ability to sit on

a jury. He may become ineligible for college or vocational training and federally supported financial aid. And he may lose his ability for various types of government-supported financial living assistance.

The implication of a first-time prison sentence was discussed in *United States v. Baker*, where the Court granted a downward variance and noted as "significant" "the district court's finding that a prison term would mean more to Mr. Baker than to a defendant who previously has been imprisoned. Consideration of this factor is consistent with § 3553's directive that the sentence reflect the need for 'just punishment.'" 445 F. 3d 987 (7th Cir. 2006). Similarly, in *United States v. Willis*, a defendant with a drug offense guideline range of 120 months (but statutory max of 60 months) was sentenced to one year and one day because the "sentence provided a substantial punishment for someone like defendant, who had never before been to jail and who engaged in no violence or dealing herself." 479 F.Supp 2d 927 (E.D. Wisc. 2007). Also, in *United States v. McGee*, a heroin distribution case, the court imposed a downward variance sentence of one year and one day because the defendant "had never before been to prison" and "[g]enerally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served some serious time yet continues to re-offend." 479 F.Supp. 2d 910 (E.D. Wisc. 2007).

In *United States v. Cabrera*, the District Court, granted a downward variance in a drug distribution case of 14 kilograms of cocaine (which has a 10 year mandatory-minimum if the individual does not qualify for safety-valve) and imposed a 24 month

14

sentence. 567 F. Supp. 2d 271, 273 (D. Mass. 2008). The Court was concerned about recidivism and specific deterrence but noted the Sentencing commission's report, *Recidivism and the "First Offender"* "suggests that individuals-like Cabrera-with zero criminal history points are less likely to recidivate than all other offenders. Commission studies show that the recidivism rate for such individuals is substantially lower than recidivism rates for other offenders, and even for offenders with only one criminal history point." *Id.* at 279, citing http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf. Likewise, Daniel Zamot has zero criminal history points. PSI ¶ 37.

According to Dr. Rapa, "As Daniel gets into appropriate treatment, remains stabilized on medication, and receives social skill training, assertiveness training, refusal skills training, and learns positive coping skills, the prognosis for him is good. Daniel accepted responsibility, expressed remorse, and expressed empathy for the victim, all of which bode well for his potential to be successfully reformed and integrated into society." Rapa at 15. Just one year ago, November 3, 2021, the school district created the following career plan for Daniel Zamot, which never came to fruition:

> Meeting Date: 11/03/2021
>
> **Transition Components**
>
> Student input was obtained through:
>
> Based on the ONet Career Inventory completed on October 29, 2021, Daniel's highest career strength is in the Realistic category: Realistic interests are for individuals that like working with real-world materials like wood, tools, and machinery. Upon reviewing Daniel's ONet Career Inventory through a student interview with him, Daniel expressed his career goal was to work for a construction company as a carpenter.
>
> The student's measurable long-term postsecondary goals related to education and/or training, employment and career, and if appropriate, independent functioning:
>
> Postsecondary Education and/or Training:
>
> Within two years of exiting the K-12 system, Daniel will have earned his certification in carpentry.
>
> Employment and Career:
>
> Employment: Within three months of earning his certification in carpentry, Daniel will obtain entry-level employment with a construction company working as a carpenter.
>
> Career: Within one year of earning his carpentry certification, Daniel will have met his career goal of becoming a carpenter for a construction company.

It's not too late. Daniel told the United States Probation Office that he wants to work in construction and that his dream job is to be an underwater welder. *See* PSI ¶ 56. Daniel grew up without a father, and it's a testament to the love, support, and guidance of his mother that Daniel has lived a law-abiding life to date. The support of his mother and siblings remain. They will help him reintegrate successfully into society after prison. Daniel Zamot's prognosis is positive. With the assistance of the United States Probation office, Daniel's family support, appropriate psychiatric medication, and access to treatment and counseling for persons with intellectual disabilities and PTSD, the course of Daniel Zamot's life could be altered. Daniel Zamot is still a damaged teenager, but there is hope for healing.

16

On November 2, 2022, AUSA Michael Porter was contacted and he objects to this motion at this time.

>Respectfully submitted,
>
>MICHAEL CARUSO
>Federal Public Defender
>
>*s/ Kristy Militello*
>Kristy Militello
>Assistant Federal Public Defender
>Attorney for the Defendant
>Florida Bar No. 0056366
>250 South Australian Avenue, Suite 400
>West Palm Beach, Florida 33401
>(561) 833-6288 - Telephone
>Kristy_Militello@fd.org

CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Kristy Militello*
Kristy Militello